[Cite as *Ultimate Salon & Spa, Inc. v. Legends Const. Group*, 2019-Ohio-2506.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| ULTIMATE SALON AND SPA, INC., | : | **O P I N I O N** |
| Plaintiff-Appellant/ Cross-Appellee, | : | |
| | : | **CASE NO. 2018-L-072** |
| - vs - | : | |
| | : | |
| LEGENDS CONSTRUCTION GROUP, | : | |
| Defendant-Appellee/ Cross-Appellant. | : | |
| | : | |

Civil Appeal from the Willoughby Municipal Court, Case No. 2017 CVF 00564.

Judgment: Affirmed in part and reversed in part.

*Judson J. Hawkins*, 37811 Lake Shore Boulevard, Eastlake, OH 44095 (For Plaintiff-Appellant/Cross-Appellee).

*Russell Andrew Randazzo*, Randazzo Law, L.L.C., 55 Public Square, Suite 2100, Cleveland, OH 44113 (For Defendant-Appellee/Cross-Appellant).


TIMOTHY P. CANNON, J.

{¶1} Appellant, Ultimate Salon and Spa, Inc. ("Ultimate"), and cross-appellant, Legends Construction Group ("Legends"), appeal the May 7, 2018 judgment of the Willoughby Municipal Court. The trial court entered judgment in favor of Ultimate against Legends, in the amount of $5,000.00 on Ultimate's claim for return of its security deposit. The trial court entered judgment in favor of Legends on its counterclaim for breach of the

parties' lease agreement, in the amount of $15,000.00, resulting in a net judgment for Legends in the amount of $10,000.00.

{¶2} This case stems from the lease agreement entered into between the parties on October 20, 2006. Ultimate leased from Legends' space in the commercial property located at 36005 Lakeshore Boulevard in Eastlake, Ohio for the purpose of running a cosmetology business. The lease states the leased premises is "approximately 3,000 sq. feet." The lease term was for "one (1) three-year period with two (2) three-year period options commencing on January 1, 2007 and ending on December 31, 2015." Ultimate was to pay a total of $72,000.00 for the first full term, payable in monthly installments of $2,000.00. For the first three-year option, Ultimate was to pay a total of $90,000.00 in monthly installments of $2,500.00, and for the second three-year option, Ultimate was to pay a total of $99,000.00 in monthly installments of $2,750.00. Ultimate occupied the premises from January 1, 2007, through December 31, 2016.

{¶3} On March 21, 2017, Ultimate filed a small claims action against Legends in the Willoughby Municipal Court for the return of a security deposit in the amount of $5,000.00. The complaint alleged: "Plaintiff and defendant entered into a lease in Jan. of 2007[.] Plaintiff has met all obligations pursuant to the lease and vacated the premises. Defendant has violated the lease by failing to return the security deposit." Attached to the complaint were several exhibits: (1) a letter from Ultimate's attorney to Matthew Miozzi, President of Legends, demanding the $5,000.00 security deposit; (2) a letter to Legends from Frank and Ann Bergant, co-owners of Ultimate, regarding vacating the leased premises; (3) a declaration of facts by Frank Bergant, signed by Frank and Ann Bergant; and (4) an undated lease agreement signed by Ann Bergant as lessee and Frank Bergant as witness with a handwritten note at the top, which states, "2nd lease 1st page [and] last

2

page [different] from original lease." The undated lease contains no signature on the signature block designated for the lessor.

{¶4} After the case was transferred to the regular docket on April 11, 2017, Legends filed an answer, denying the allegations in the complaint and denying the content of the exhibits. Legends also filed a counterclaim, alleging that Ultimate breached the lease agreement when it failed to return the leased premises in the same condition it was received. Legends alleged Ultimate made "in excess of $50,000, worth of alterations, changes, and construction changes to the premises" during the term of the lease, and Legends spent "tens of thousands of dollars in construction costs" to return the premises to its pre-lease condition. Legends requested monetary damages in the amount of $15,000.00. The following documents were attached to the answer and counterclaim: (1) several plans depicting the layout of the leased premises; (2) the lease agreement of October 20, 2006, signed by Matthew Miozzi as lessor, Ann Bergant as lessee, and a witness; and (3) permits from the City of Eastlake Building Department. Ultimate filed an answer to the counterclaim on May 26, 2017.

{¶5} On December 1, 2017, Ultimate filed a motion for summary judgment. Ultimate contended that two lease agreements existed between the parties: (1) the October 20, 2006 lease agreement and (2) a subsequent lease agreement sent to Ultimate by Legends in "October or November of 2007," which was the same document that was attached to its complaint. Ultimate argued that under both lease agreements, it was entitled to the return of the security deposit. Attached to its summary judgment motion were copies of both lease agreements and the affidavits of Frank and Ann Bergant.

3

**{¶6}** On December 14, 2017, Ultimate filed a motion for a protective order, requesting an order of protection "prohibiting the Defendant from obtaining any information concerning the independent contractors used by the Plaintiff in the pursuit of its business." Ultimate maintained that Legends sent a set of interrogatories and a request to produce, "requesting proprietary information concerning the identities and rates of compensation between Plaintiff and its independent contractors."

**{¶7}** On January 2, 2018, Legends filed a "Brief in Opposition to Plaintiff's Motion For Summary Judgment and Defendant's Motion for Summary Judgment." Legends argued it never executed the purported second lease agreement, noting the agreement does not indicate the parties to the lease and was not signed by Legends or one of its representatives. Legends contended it was entitled to judgment on its breach of contract claim because Ultimate breached multiple terms of the October 20, 2006 lease agreement, to wit: (1) Ultimate "allowed other business owners to operate their own businesses out of the Leased Premises in violation [of] Section 2 of the Lease Agreement"; (2) "Ultimate breached the rent obligation of the Lease Agreement" in violation of Section 18; and (3) Ultimate returned the leased premises in a condition materially different from the condition it was received on January 1, 2007. Legends further argued that due to its breach of the lease agreement, Ultimate was not entitled to return of the security deposit. No exhibits were attached to the motion for summary judgment. On the same day, however, Legends filed a "Notice of Filing of Deposition Transcript and Exhibits." Attached to that notice were the depositions of Frank and Ann Bergant and Matthew Miozzi; plans depicting the leased premises; Ultimate's 2015 income tax return; the October 20, 2006 lease agreement; permits from the City of Eastlake Building Department; and notes from the "Division of Inspection" dated October 25, 2007.

4

{¶8}   A magistrate's decision was issued on January 30, 2018, which addressed Ultimate's motion for a protective order and the parties' competing motions for summary judgment.   Regarding Ultimate's motion for a protective order, the magistrate's decision states:

> Plaintiff has requested an order of protection prohibiting Defendant from obtaining any information, either through discovery, or at trial regarding independent contractors used by the Plaintiff in pursuit of its business.  It is the position of the Defendant that the independent contractors are "legally not employees' and therefore permitting them to work in the leased premises was in violation of the Lease. Defendant cites no authority where independent contractors engaged in the salon business, working solely at a salon, are not employees for purposes of the salon business.
>
> Whether a worker is an 'employee' or 'independent contractor' is critical when it comes to such issues as pension eligibility, workers' compensation, and wage and hour law.  The Internal Revenue Service has an interest in this distinction, perhaps more than other agencies.  Additionally, an important distinction on the definition of an employee vs. an independent contractor is whether the service provided by the independent contractor is an integral part of the employer's business.  See *U.S. v. Silk*, 331 U.S. 704, 67 S. C.t. 1463, 1469, 91 L.Ed. 1757 (1947).  There is no argument where salon workers are not integral to the work in a salon.
>
> The protection order is granted as to no discovery may be had regarding the subject of independent contractors used by the Plaintiff in the pursuit of its business.

The magistrate's decision further states that there remain genuine issues of material fact to be litigated and that both motions for summary judgment are denied.   Neither party filed objections to the magistrate's decision.

{¶9}   The trial court entered an order adopting the magistrate's decision on the same day.  The trial court ordered Ultimate's motion for a protection order was granted and summarily denied both motions for summary judgment.

{¶10}  The matter proceeded to a bench trial on March 23, 2018.

5

{¶11} Frank Bergant, Vice-President of Ultimate, testified that he first approached Matthew Miozzi in the summer of 2006 about renting space in the building at 36005 Lakeshore Boulevard. He and his wife Ann Bergant intended to use the space for their salon and spa business. The parties entered into a lease agreement in October 2006. The building had previously been a Burger King restaurant, and renovations were necessary to make it suitable for a salon. Mr. Bergant testified he paid Mr. Miozzi to renovate the leased premises. After the renovations, the Bergants took possession of the premises on January 1, 2007.

{¶12} Towards the end of 2007, the Bergants wanted to expand their business. After a discussion with Mr. Miozzi, they took possession of an additional 1,000 square feet of the building. They paid Mr. Miozzi to renovate the expansion. Mr. Bergant explained: "We paid him to do the remodel of it, because it was his building and he asked if he can do the work."

{¶13} Mr. Bergant testified that after acquiring the additional area, Mr. Miozzi sent him a new lease agreement. The second lease agreement was entered into evidence. It does not list a lessor and lessee and is undated. It also states a different lease term and payment terms than the first lease. The term of the second lease is "for one (1) three-year period with one (1) five-year period option commencing on January 1, 2007 and ending on December 31, 2014." The payment terms provide:

> For the initial term, Lessee shall pay to Lessor at the address specified above as rent ("Base Rent") for the Premises for the full term thereof the sum of $79,200.00, payable in payments of $2,000.00 for the first twelve (12) months and $2,300.00 for the next twenty-four (24) months on the first day of each month for the term of this lease. Base Rent owed for any period less than a calendar month shall be computed on pro-rated basis.

6

For the first five-year option, the total sum of $162,000.00 in sixty (60) monthly payments of $2,700.00.

There are two handwritten notes in the margins of the second lease. Next to the description of the premises, which states it is "approximately 3,000 sq. feet," there is a handwritten "4,000-". Next to the payment terms there is a handwritten "3,500-". Mr. Bergant testified those notes were made by Mr. Miozzi and were in his handwriting. Mr. Bergant explained the note of "4,000" reflected the increased square footage of the leased premises and the note of "3,500" indicated the increased rent.

{¶14} Mr. Bergant testified that he and his wife signed the new agreement and returned it to Mr. Miozzi. When presented with the new lease agreement, Mr. Bergant affirmed it was not signed by Mr. Miozzi. The only signatures on the lease are "Frank Bergant" on the signature block for "Witness" and "Ann M. Bergant" on the signature block for "Lessee." Mr. Bergant testified they began paying $3,500.00 in rent beginning in 2010.

{¶15} Additional renovations were made to the premises in 2011, which included relocation of the ceiling. Mr. Bergant testified that subsequently there was also "work done on our reception area, our pedicure area and our hair station area where we had the ceilings lowered down." All of the renovations were discussed with Mr. Miozzi, and Mr. Bergant explained: "Since it was his building, again he wanted to do the work. So we paid him."

{¶16} Mr. Bergant testified he believed Mr. Miozzi was doing all the renovation work through "Legends Construction," the same company that was the landlord for the building. He further explained that Mr. Miozzi approved all renovations.

{¶17} In October 2016, the Bergants decided to downsize their business to a smaller building and informed Mr. Miozzi they would be vacating the premises. Mr.

7

Bergant testified that during the final walk-through, Mr. Miozzi indicated he intended to turn the building into a salon for booth rentals and requested to keep several of the fixtures, including the reception desk, shampoo stations, cabinets, and shelving.

{¶18} Mr. Bergant testified that Mr. Miozzi later informed him they would not be getting back their security deposit because they failed to return the building to "the way it was."

{¶19} Mr. Bergant testified that Ultimate ceased business operations on December 31, 2016, but did not vacate the building until January 3, 2017, in order to clean the premises.

{¶20} Mr. Bergant testified that no representative of Legends ever asked him for an increase of 150% of the rent for the holdover period. Mr. Bergant testified that had they been requested to pay the increased rent, he and his wife would have looked for a new building and vacated the premises. Mr. Bergant testified that he personally delivered each rent check to Mr. Miozzi and that the rent checks were always accepted.

{¶21} Matthew Miozzi, President of Legends, testified that he entered into a lease agreement with the Bergants in 2006. Mr. Miozzi testified that they requested renovations be made to the property. The Bergants contacted "Today's Lifestyle" construction to make the renovations. Mr. Miozzi explained that Legends does not own Today's Lifestyle and they are two separate entities.

{¶22} Mr. Miozzi affirmed that the Bergants negotiated with him regarding the renovations, and he agreed to do the work necessary for the renovations. Although Ultimate was allowed to make the renovations, Mr. Miozzo testified he nonetheless expected the premises would be returned "to the original condition, basically a wide open box, ceiling in good condition, all the exterior walls in good condition." Mr. Miozzi testified

8

that after Ultimate moved out of the building, Legends spent "between 20 and $30,000" to return the building "back to the condition in which Ultimate Salon & Spa received it."

{¶23} Mr. Miozzi further testified he never received any holdover rental payment from Ultimate.

{¶24} On cross-examination, Mr. Miozzi testified that during the term of the lease he was President of both Legends and Today's Lifestyle. He affirmed that when the Bergants negotiated with him, they were negotiating with the president of both companies.

{¶25} Mr. Miozzi testified that with regard to the 150% holdover rent, he never demanded the rent either orally or in writing.

{¶26} The trial court entered judgment on May 7, 2018. The trial court determined that the October 20, 2006 lease agreement was signed by the parties and enforceable. Regarding the unsigned second lease, the trial court stated:

> Plaintiff has requested the Court to consider a second lease in this matter, signed by plaintiff and submitted as plaintiff's Exhibit 2. This lease incorporates plaintiff's position as to the square footage and rent terms. However, defendant denies executing this lease, which is not signed by defendant, nor is it dated. Consistent with the position of this Court to accept only known terms of an executed contract, the Court will not consider Plaintiff's Exhibit 2 as a valid and enforceable lease and will refer only to Plaintiff's Exhibit 1, and any other credible testimony or evidence.

The court further stated that "based on the law and credibility of the witnesses, the Court finds that Plaintiff complied with all provisions of the lease, including surrendering the premises to the Lessor in the same condition as when received." The trial court determined that Ultimate had made a proper demand for return of the security deposit. The judgment entry further states:

> The lease term pursuant to plaintiff's Exhibit 1 is for the period ending on December 31, 2015. Both parties are in agreement that the plaintiff remained in possession of the premises through December

9

31, 2016. Despite the rental terms in the original lease, the parties also agree plaintiff was paying $3,500.00 per month rent on December 31, 2015. Section 18 of the lease provides for an occupancy considered to be month-to-month tenancy with a rental amount of 150% of the last monthly rental, absent the 'express written consent of the Lessor' to operate otherwise, during any holdover period. The holdover period is established as January 1, 2016 through December 31, 2016, a period of 12 months. At 150% of $3,500.00, the monthly obligation for this twelve-month period was $5,250.00, with a total term of $63,000.00. Plaintiff paid $42,000.00. This deficiency exceeds the monetary jurisdiction of the court.

\* \* \*

Plaintiff \* \* \* argues that by not specifically demanding the additional rent and by accepting less than the agreed rent, defendant has waived this contractual right and is estopped from asserting a claim for the rent. Plaintiff's claim that under the commercial tenant-landlord code, landlord's acceptance of less rent somehow modifies a lease has no basis under the law.

The trial court ruled in favor of Legends on its counterclaim.

{¶27} Ultimate noticed a timely appeal and raises one assignment of error. Legends filed a cross-appeal and asserts four assignments of error.

{¶28} We first address Ultimate's assignment of error. The assignment of error states:

{¶29} "The trial court prejudicially erred when it ruled that the doctrines of waiver and estoppel had no basis in law and did not estop Appellee from asserting its contractual claim for 150% of rent during a holdover period."

{¶30} "When reviewing a civil appeal from a bench trial, we apply a manifest weight standard of review." *San Allen, Inc. v. Buehrer*, 8th Dist. Cuyahoga No. 99786, 2014-Ohio-2071, ¶89 (citations omitted). "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 81 (1984). This court

10

reviews questions of law de novo. *Hayward v. Summa Health Sys./Akron City Hosp.*, 139 Ohio St.3d 238, 2014-Ohio-1913, ¶23; *Office of Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110 (1979) ("[a]s to questions of law, [a reviewing] court has complete, independent power of review[;] [l]egal issues are accordingly subject to more intensive examination than are factual questions"). Accordingly, on appeal from a bench trial we review the trial court's factual findings under the manifest weight standard of review, while the trial court's legal findings are reviewed de novo.

**{¶31}** A waiver is a voluntary relinquishment of a known right and applies to all personal rights and privileges. *Chubb v. Ohio Bur. of Workers' Comp.*, 81 Ohio St.3d 275, 278 (1998) (citation omitted). "Waiver assumes one has an opportunity to choose between either relinquishing or enforcing of the right. A waiver may be enforced by the person who had a duty to perform and who changed his or her position as a result of the waiver." *Id.*, citing *Andrews v. State Teachers Retirement Sys. Bd.*, 62 Ohio St.2d 202, 205 (1980).

**{¶32}** "Although waiver is typical of estoppel, estoppel is a separate and distinct doctrine." *Id.* Estoppel does not require the intent to relinquish a known right. *Id.* "[T]he doctrine of equitable estoppel precludes a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good faith reliance upon the party's conduct." *Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co.*, 93 Ohio App.3d 292, 295 (9th Dist.1994), citing *State ex rel. Cities Serv. Oil Co. v. Orteca*, 63 Ohio St.2d 295, 299 (1980).

**{¶33}** "'Waiver by estoppel allows a party's inconsistent conduct, rather than a party's intent, to establish a waiver of rights.'" *Baumgartner v. AIM Leasing*, 11th Dist. Trumbull No. 2012-T-0070, 2013-Ohio-883, ¶26, quoting *Nedel v. Nedel*, 11th Dist.

11

Portage No. 2007-P-0022, 2008-Ohio-1025, ¶47. Waiver by estoppel exists when the acts and conduct of a party are inconsistent with the intent to claim a right and have been such as to mislead the other party to his prejudice, thereby estopping the party claiming the right from asserting it. *Id.*, citing *Nedel*, *supra*, at ¶47.

{¶34} In addition to waiver by estoppel, estoppel by laches is an equitable defense where a party purposefully delays in asserting its legal rights, resulting in prejudice to another. "[T]he usual elements of laches are (1) that the party against whom the laches defense is asserted unreasonably delayed asserting a claim; (2) that the party against whom the laches defense is asserted had knowledge of the wrongful acts and the injurious consequences and acquiesced to said acts; and (3) that the party asserting laches was prejudiced by the delay." *State ex rel. Madden v. Windham Exempted Village School Dist.*, 11th Dist. Portage No. 1718, 1987 WL 16575, *3 (Sept. 4, 1987), citing 66 Ohio Jurisprudence 3d, Limitations and Laches, Sections 223-225 (1986); *see also State ex rel. Leneghan v. Husted*, 154 Ohio St.3d 60, 2018-Ohio-3361, ¶18.

{¶35} It is important to note that the trial court determined the October 20, 2006 lease agreement was a valid and enforceable lease *and* that the subsequent lease agreement was *not* enforceable. Neither party has appealed that determination. Section 18[1] of the lease agreement contains the holdover provision at issue, stating:

> If the Lessee remains in possession of the Premises or any part thereof after the expiration of the term hereof without the express written consent of the Lessor, such occupancy shall be a tenancy from month-to-month at a rental in the amount of one hundred fifty (150%) of the last monthly rental plus all other charges (including Operating Expenses) payable hereunder. After such termination date, the Lessee, within thirty (30) days from the receipt of notice from Lessor stating the effective date of termination, shall remove all

---

1. Section 18 is the same in the October 20, 2006 lease agreement and the subsequent undated agreement the trial court found was unenforceable.

> of its property from the Premises and surrender possession thereof to Lessor in the condition required by this Lease.

The lease term under the October 20, 2006 lease agreement was from January 1, 2007 through December 31, 2015. The trial court found the parties agreed Ultimate did not vacate the premises until December 31, 2016, and determined the holdover period was January 1, 2016 through December 31, 2016, a period of 12 months. However, it is without question that the parties mutually revised the first lease to allow for, at a minimum, a different rental amount and a different description of the leased premises.

{¶36} The trial court did not provide any legal analysis with regard to Ultimate's waiver claim. As set forth above, waiver and estoppel are valid defenses that may be asserted in contract claims. Based on the conduct of the parties and the particular facts and circumstances of this case, the evidence clearly supports the legal conclusion that Legends waived the lease agreement's holdover provision. Frank Bergant testified Ultimate began paying monthly rent of $3,500.00 in 2010. Legends does not dispute that Ultimate made rental payments throughout 2016 but contends that, during the holdover period, Ultimate failed to make payments in an amount equal to 150% of the last rental amount. At trial, Mr. Miozzi affirmed that "for more than a year [the Bergants] relied on your silence and they paid you the rent in the lease." It is undisputed that Mr. Miozzi never demanded, either orally or in writing, the 150% holdover rent. Mr. Miozzi never notified Ultimate that they were holding over their term or that he had any objection to their remaining as tenants for a period of time. For a year, Mr. Miozzi accepted $3,500.00 as monthly rent without objection. It was not until the Bergants brought a claim for the return of their security deposit that Legends asserted a claim under Section 18. Further,

Mr. Bergant testified that, had Mr. Miozzi demanded the increased rent, the Bergants would have terminated the lease and moved their business.

{¶37} In *The Strip Delaware, LLC v. Landry's Restaurants, Inc.*, 5th Dist. Stark Nos. 2008CA00146 & 2008CA00160, 2009-Ohio-1106, the Fifth District Court of Appeals discussed a lease with a similar 150% holdover provision:

> 'A holdover generally is "based upon an implied agreement, and indicates on the part of the tenant that he intends to continue the relationship." *Palevsky v. Bentfield* (1933), 46 Ohio App. 385, 387, 188 N.E. 660. In general terms, a holdover occurs when a tenant maintains possession or occupancy of the premises past the expiration date of the lease agreement. See *Bumiller v. Walker* (1917), 95 Ohio St. 344, 116 N.E. 797; *Steiner v. Minkowski* (1991), 72 Ohio App.3d 754, 762, 596 N.E.2d 492.' [*Inzetta v. Ohio Bell Telephone Co.*, 10th Dist. Franklin No. 00AP-1084, 2001 WL 438700,] at 2.
>
> *Steiner* explains a landlord may treat holdover tenants as trespassers or hold them to a new lease term. The conduct of the parties determines whether an implied contract arises. If the tenant holds over and continues paying the same rent, an implied contract arises and is governed by the provisions of the original lease. The same result is reached if a tenant remains on the premises and fails to pay the rent. A landlord may unilaterally increase the rent for the holdover period, but the holdover tenant will not be held liable for the difference between the rent stated in the lease and the rent after the increase if the tenant expresses dissent to the increase. Steiner at 762, citations deleted.

*Id.* at ¶17-18.

{¶38} Here, it is clear that, due to the length of time that passed while Legends accepted the continuing rent without objection, an implied contract arose, and Legends accepted a new lease term governed by the provisions of the original lease.

{¶39} Further, Legends is estopped from enforcing the holdover provision under the equitable doctrine of laches. Its failure to assert rights under the holdover provision for nearly an entire year constitutes an unreasonable delay in asserting a claim. It is also

14

undisputed that Legends had knowledge of the holdover acts and the injurious consequences—i.e., the continued tenancy of Ultimate without payment of the holdover rent premium—and acquiesced to it. Finally, Ultimate would be prejudiced by the delay as it would be retroactively charged a much higher rent without the opportunity to refuse the arrangement and vacate.

{¶40} Legends argues the trial court properly decided that the doctrines of waiver and estoppel are inapplicable in this case. In support, Legends directs us to consider our decision in *Brunswick Ltd. Partnership v. Feudo*, 11th Dist. Lake No. 2006-L-151, 2007-Ohio-2163. In that case, the parties negotiated over several months for revised terms prior to the expiration of the lease. Ultimately, they were unable to agree to terms past the expiration date of the lease. *Id.* at ¶3. However, the lessees remained on the rental premises for four months after the expiration of the lease, *with the knowledge they had no agreement to be there*. *Id.* at ¶4. The lessor filed a complaint for damages and sought to enforce a holdover clause that included a provision for double rent during the holdover period. *Id.* at ¶5. The trial court entered judgment in favor of the lessor and determined the lessee owed double rent for the four months of holding over. *Id.* at ¶7. The lessee appealed, arguing the double rent provision in the holdover clause was an illegal penalty provision. *Id.* at ¶9-10. We determined that a "double-rent provision for a holdover tenant in [a] commercial lease is not, without more, an illegal penalty provision." *Id.* at ¶27. Waiver and estoppel were not at issue in that case. Accordingly, we find *Brunswick* inapplicable. Legends' argument is not well taken.

{¶41} In this case, there is no evidence that suggests Legends did not want Ultimate to remain on the premises during the holdover period. Legends treated Ultimate as a month-to-month tenant after the expiration of the lease period. Legends failed to

notify Ultimate that it considered Ultimate wrongfully in possession of the premises as a holdover and further failed to notify Ultimate that Legends was invoking the holdover provisions of the 2006 lease. For one year, Legends continued to accept rent as it had in the past. The holdover provision was, therefore, unenforceable against Ultimate. Because Legends waived the holdover provision in the lease for an unreasonable amount of time without justification—which resulted in prejudice to Ultimate—it is now estopped from claiming a right to the holdover rent. The trial court erred in ruling in favor of Legends on its breach of contract claim. Accordingly, the trial court's decision awarding Legends $15,000.00 in damages is reversed.

{¶42} Ultimate's sole assignment of error has merit.

{¶43} We next address the assignments of error raised by Legends in its cross-appeal.

{¶44} The first assignment of error states:

> The Trial Court erred by not granting summary judgment in favor of Appellee/Cross-Appellant Legends Construction Group on Ultimate's complaint as Ultimate breached numerous terms of the Lease Agreement thereby forfeiting the return of its security deposit under Section 5 of the Lease Agreement.

{¶45} "Ordinarily, 'the denial of a motion for summary judgment is not a point of consideration in an appeal from a final judgment entered following a trial on the merits.'" *Capella III, L.L.C. v. Wilcox*, 10th Dist. Franklin No. 10AP-206, 2010-Ohio-4746, ¶13, quoting *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 156 (1994). "[D]enial of a motion for summary judgment generally cannot be reversed on appeal if the matter has gone to trial on the identical factual issues raised in the summary judgment motion." *Schaefer v. Bolog*, 7th Dist. Mahoning No. 17 MA 0085, 2018-Ohio-1337, ¶21, citing *Continental*, *supra*, at 156.

16

**{¶46}** Further, Civ.R. 53(D)(3)(b)(iv) states, "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion [in a magistrate's decision], whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)."

**{¶47}** Legends argues the trial court erred in denying its motion for summary judgment on Ultimate's claim for return of the security deposit because Ultimate breached several terms of the lease agreement. Legends argues Ultimate breached the lease when it allowed independent contractors to operate out of the leased premises; untimely paid the security deposit; failed to return the leased premises in its original condition; and failed to pay the holdover rent.

**{¶48}** The issues regarding untimely payment of the security deposit, failure to return the leased premises to its original condition, and failure to pay the holdover rent involve issues of fact that were actually litigated at trial. Moreover, on appeal we have determined the trial court's ruling regarding the holdover rent must be reversed.

**{¶49}** The issue raised pertaining to independent contractors working on the leased premises in violation of Section 2 of the lease agreement was not actually litigated at trial. The trial court ruled on that issue prior to trial on January 30, 2018, when it adopted the magistrate's decision and granted Ultimate's request for a protection order. However, Legends failed to object to the magistrate's decision on this issue and has therefore waived all but plain error review.

**{¶50}** In its motion for summary judgment and on appeal, Legends has cited no law or directed the court to any evidence that affirmatively demonstrates plain error with

17

regard to the status of the subcontractors as independent contractors rather than employees. Accordingly, we find Legends failed to demonstrate plain error.

**{¶51}** The first assignment of error is without merit.

**{¶52}** We address the second, third, and fourth assignments of error together. They state:

> [2.] The Trial Court erred by not granting summary judgment in favor of Appellee/Cross-Appellant Legends Construction Group on its Counterclaim for breach of contract to the full amount awardable by the court of $15,000.00.

> [3.] The Trial Court erred in its Judgment upon trial when it awarded Ultimate the return of its security deposit when the Trial Court found Ultimate breached the holdover provision of the Lease Agreement.

> [4.] The Trial Court erred in its Judgment upon trial when it failed to award Appellee/Cross-Appellant the full $15,000.00, as damages for Ultimate's breach of the Lease Agreement.

**{¶53}** Under its second assignment of error, Legends argues the trial court erred in denying its motion for summary judgment on its claim for breach of contract for the full amount of damages of $15,000.00. Legends argues it was entitled to the full amount of damages because Ultimate breached the lease agreement when it failed to pay the holdover rent pursuant to Section 18 of the lease agreement throughout 2016.

**{¶54}** Under its third assignment of error, Legends argues Ultimate was not entitled to the return of its security deposit because the trial court found Ultimate had breached the holdover provision of the lease agreement.

**{¶55}** Under its fourth assignment of error, Legends argues the trial court erred when it failed to award Legends the full amount of $15,000.00 as damages on its breach of contract claim.

18

{¶56} Our determination regarding Ultimate's sole assignment of error is dispositive of Legends' second, third, and fourth assignments of error. Accordingly, these assignments of error are without merit.

{¶57} For the foregoing reasons, the judgment of the Willoughby Municipal Court is reversed with regard to the award of holdover rent to Legends. The remainder of the judgment is affirmed.

{¶58} The award for Ultimate of $5,000.00 on its claim for return of security deposit is affirmed, and Legends' award of $15,000.00 for holdover rent is hereby vacated.


THOMAS R. WRIGHT, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.

19